**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **HASEEB ABDULLAH,** | |
| *Plaintiff/Petitioner,* | |
| v. | CIVIL ACTION No. 1:20-cv-01245-RP |
| **KEN PAXTON, ET AL.,** | |
| *Defendants/Respondents.* | |

**PLAINTIFF HASEEB ABDULLAH'S OBJECTIONS TO REPORT AND**
**RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 4(b) of Appendix C to the Local Rules of this Court, Plaintiff Haseeb Abdullah ("Plaintiff" or "Abdullah") hereby timely files his Objections to the Report and Recommendation of United States Magistrate Judge Dustin Howell, lodged with the Court on November 8, 2021. Dkt. 32 (the "Report"). For the reasons set forth with specificity below, Plaintiff respectfully requests this Court decline to follow the recommendations in Report, and permit the above-captioned matter to proceed through litigation.

## I.    Introduction and Brief Factual Background

Plaintiff brought his Original Complaint against Texas Attorney General Ken Paxton and Comptroller Glenn Hegar, asserting that Section 808 of the Texas Government Code ("Section 808") is unlawful and unconstitutional pursuant to federal law, and that its promulgation subjects his own vested and ongoing interest in the management of his pension benefits to a present and future threat of harm.[1] *See generally* Dkt. 1. On March 26, 2021, Defendants filed motions to

---

[1] Plaintiff originally included Porter Wilson, the Executive Director of the State of Texas Employee Retirement System ("ERS") and Amy Bishop in her official capacity as Executive Director of the Texas County and District Retirement System ("TCDRS") as defendants; however, he subsequently moved to voluntarily drop them from the case. Dkts. 18, 19.

dismiss Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Dkt. 26.

As set forth in Plaintiff's Complaint, he worked for the State of Texas from September 2008 until March 2018, during which time he made mandatory monthly contributions of a portion of his pre-tax salary to the ERS. *Id.* at ¶¶ 11-12. Employee contributions have risen in recent years in order to maintain the solvency of the ERS pension system. *Id.* at ¶ 13. Although Plaintiff is no longer a State of Texas employee, he is still an ERS member and ERS still maintains and oversees his pension benefits. *Id.* at ¶ 14. Now that Plaintiff is an employee of Travis County, a mandatory 7% of Plaintiff's gross salary is deducted each pay period and paid into the TCDRS. *Id.* at ¶ 31. Under this system, an employee fully vests after eight years of service. *Id.*; *see also* TEX. CONST. ART., XVI, § 67(c)(1)(A) (requiring by law that the Texas legislature provide for the creation by a city or county a system of benefits for its employees and officers). Plaintiff and all other similarly situated Texas government employees rely on ERS and TCDRS to make sound fiduciary decisions with respect to the management of the funds supporting his pension benefits.

Section 808 of the Texas Government Code prohibits certain retirement systems, including ERS and TCDRS, from investing in and requires divestment from companies designated by the Comptroller as participating in BDS.[2] Compl. at ¶¶ 22-23. Section 808 requires these systems to "sell, redeem, divest, or withdraw all publicly traded securities of the company" if a company boycotts Israel or otherwise participates in BDS activities. *Id.* at ¶ 22 (quoting § 808.055). Anti-BDS laws like Section 808 require fiduciaries to examine factors unrelated to financial outcomes in making investment and divestment decisions affecting the relevant funds. The anti-BDS provisions of Section 808 are unconstitutional and harm the interests of Texas public employees,

---

[2] Provisions like Section 808 are broadly referred to as "anti-BDS laws," with "BDS" referring to the Palestinian-led peaceful movement to boycott ("boycott, divest, sanctions") Israel and Israeli-based products based on Israel's occupation of Palestine and its citizens.

like Plaintiff, whose benefits are subject to them. Plaintiff's Complaint identifies his vested interest in the management of his own pension benefits, to which he has consistently contributed and continues to contribute through his current employment. And, this action for declaratory judgment presents Plaintiff's only available avenue to challenge the Texas legislation that harms that interest. On November 8, 2021 Magistrate Judge Dustin Howell filed the Report, recommending Plaintiff's case be dismissed for lack of standing under Fed. R. Civ. P. 12(b)(1). Dkt. 32 at 3 (concluding that "[t]he undersigned finds this case is properly dismissed for lack of subject matter-jurisdiction, so does not address the parties' Rule 12(b)(6) arguments"). The Report did not reach the merits of Plaintiff's claims, and these Objections relate solely to the Report's jurisdictional findings. In brief, Plaintiff objects to the Report's conclusions that 1) the Comptroller is entitled to sovereign immunity; 2) Plaintiff lacks standing to bring his claims; and 3) Plaintiff fails to satisfy redressability requirements. *See generally* Dkt. 32. Further, Plaintiff incorporates the briefing contained in his Response in Opposition to Defendants' Motion to Dismiss by reference only, narrowing his Objections here to the analysis and conclusions set forth in the Report.

## II.    Legal Standard

Pursuant to § 636(b)(1), a district court, on its own motion, may refer a pending matter to a United States Magistrate Judge for initial consideration and the preparation of a Report and Recommendation. *Flynn v. State Farm Fire & Cas. Ins*. Co., 605 F. Supp. 2d 811, 813-14 (W.D. Tex. 2009). A party may contest the Report and Recommendation by filing written objections to the Magistrate Judge's specific findings. This Court then reviews the challenged portions of the Report and Recommendation *de novo*. *See* 28 U.S.C. § 636(b)(1) (noting that the "judge of the court shall make a *de novo* determination of those portions of the report of specified proposed findings or recommendations to which objection is made"); *see also Thomas v. Arn,* 474 U.S. 140,

3

151 (1985) (explaining that written objections must specifically identify the findings or recommendations the party wishes the district court to consider).

## III.   Plaintiff's Objections

### A.   The Comptroller Does Not Have Sovereign Immunity

Plaintiff objects to the Report's finding that sovereign immunity bars the suit against Defendant Hegar. Specifically, the Report concludes that the Comptroller lacks a sufficient connection to the enforcement of Section 808 that would warrant application of the exception carved out by *Ex parte Young*. Dkt. 32 at 4-7; 209 U.S. 123 (1908). Suits against a state are generally barred by the Eleventh Amendment; *Ex parte Young*, however, creates an exception when a plaintiff brings suit for prospective relief against state officials who act in violation of federal law. *Id.* In order for *Ex parte Young* to apply, the defendant must have some connection to the enforcement and administration of the challenged law. *See Morris v. Livingston,* 739 F.3d 740, 742 (5th Cir. 2014) (explaining that the proper defendant must have a connection to the challenged law's administration and enforcement). Defendants contend, and the Report agreed, that Defendant Hegar is immune from suit because he is insufficiently connected to the enforcement and administration of Section 808. Dkt. 32 at 4-7. Plaintiff objects because the Report's characterization of the degree of connection necessary for an *Ex parte Young* suit is inconsistent with applicable Fifth Circuit precedent. Specifically, Plaintiff objects to the Report's reliance on *City of Austin v. Paxton,* 943 F.3d 993, 997 (5th Cir. 2019) and *Morris v. Livingston,* 739 F.3d 740, 746 (5th Cir. 2014).   The Report relies on *City of Austin* and *Morris* as support for the conclusion that the Comptroller cannot be an appropriate defendant because "the Texas Attorney General is specifically named as the enforcer of Chapter 808[,]" asserting that where a specific

state actor is tasked with enforcing the challenged law and the lawsuit names a different official, the "*Young* analysis ends." Dkt. 32 at 7 (quoting *Morris,* 739 F.3d at 745-46).

The Fifth Circuit has not yet established "a clear test for when a state officially is sufficiently connected to the enforcement of a state law so as to be a proper defendant under *Ex parte Young*." *Whole Women's Health v. Jackson,* No. 1:21-CV-616-RP, 2021 U.S. Dist. LEXIS 163815, at *22-23 (W.D. Tex. Aug. 25, 2021) (citing *City of Austin,* 943 F.3d at 997, for the proposition that the definition of a sufficient connection to enforcement is not clear in Fifth Circuit jurisprudence).  A general duty to enforce laws in the state does not suffice. However, "the challenged law need not actually state the official's duty to enforce it[;]" an explicit statement merely makes the duty clearer. *City of Austin,* 943 F.3d at 998. Section 808 specifically tasks the Comptroller with creating and promulgating the list of companies that should be divested from for engaging in BDS activity, removing the companies from that list if they cease BDS participation, and assessing whether an entity should cease divestment from a company on the list. Specifically, Section 808.051 provides that "(a) [t]he comptroller shall prepare and maintain and provide to each state governmental entity, a list of all companies that boycott Israel[;]" (b) the comptroller shall update the list annually or more often as the comptroller considers necessary…;and "(c) the comptroller shall file the list with the presiding officer of each house of the legislature and the attorney general and post the list on a publicly available website." TEX. GOV. CODE § 808.051. This provision tasks the Comptroller with the creation, maintenance and publication of the list of companies that boycott Israel, triggering the investment/divestment decisions which form the subject of this suit. Under Section 808.053(c), if a listed "company ceases boycotting Israel, the comptroller shall remove the company from the list." Removing a company from that list lifts any investment restrictions with it. These actions squarely qualify as enforcing, administering and

maintaining the provisions of Section 808, even without being specifically named in the statute. *Id*. § 808.053(c). And, under Section 808.056(c), a state governmental entity which intends to cease divestment from a listed company must first "provide a written report to the comptroller…setting forth the reason and justification, supported by clear and convincing evidence." *Id*. § 808.056(c); Doc. 1 at ¶¶ 71, 75, 85. This power to administer divestment and investment decisions goes to the heart of effectuating Section 808's purpose; the Comptroller carries out these essential functions.

Relying primarily on *Morris* and *Paxton,* however, the Report claims the Comptroller's connection to the administration and enforcement of Section 808 is insufficient under *Ex parte Young.* Specifically, the Report posits that "[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent." Dkt. 32 at 5 (citing *Morris,* F.3d 740 at 746). This unsupported reach exceeds the degree of connection required under *Ex parte Young,* directly contravening Fifth Circuit precedent clearly instructing the opposite: that it is <u>not</u> necessary for the defendant to be tasked with enforcement in the text of the challenged statute. *City of Austin,* 943 F.3d at 998 (holding that "the challenged law need not actually state the official's duty to enforce it," such an explicit statement merely makes the duty clearer.); *see also Okpalobi v. Foster,* 244 F.3d 405, 418-19 (5th Cir. 2001) (explaining that "the correct interpretation of *Young* concludes that no … special charge need be found directly in the challenged statute to meet the requisite 'some connection' so long as there is sufficient indicia of the defendant's enforcement powers found elsewhere in the laws of the state[,]" because "it has not … been held that it was necessary that such duty should be declared in the same act which is to be enforced"). Plaintiff therefore objects to this interpretation of the requisite connection under

*Ex parte Young*, as improperly raising the level of connection needed and contradicting relevant Fifth Circuit precedent on this issue.

Plaintiff further objects to the Report's reliance on *Morris* and *City of Austin* for its conclusion that only the Attorney General constitutes a proper defendant. *Morris*, 739 F.3d at 746; *City of* Austin, 943 F.3d at 998. These cases do not stand for the open-and-shut proposition that if an individual *is* tasked with the enforcement in a statute, no other defendant can ever be appropriate. Rather, the Court in *Morris* found Governor Rick Perry to be an inappropriate defendant where the challenged statute "did not suggest that he will play any role at all in [the] enforcement" of the challenged statute, and the law at issue in *Morris* specifically named a different agency as the appropriate enforcer of the law. *Morris,* 739 F.3d at 746. Read correctly, *Morris* merely stands for the proposition that a state actor with no connection to the enforcement of a law cannot be deemed a proper defendant; *Morris* does not hold that the only proper defendant is one explicitly named within the text of the statute; as noted above, that need not occur. *City of Austin,* in turn, echoed the *Morris* holding that where an agency is tasked with enforcement and a different, wholly unconnected individual is named as the defendant, the inquiry must end. *City of Austin* actually evaluated a law where "no state official or agency is named in the statute in question[,]" and is thus distinguishable. *City of Austin,* 943 F.3d at 998. Here, by contrast, the Comptroller is specifically identified within the challenged law, and specifically tasked with a number of functions related to enforcing and constraining the application of Section 808. Neither of these cases stands for the proposition represented in the Report that the *only* appropriate defendant under *Ex Parte Young* is one explicitly named as the enforcer of the statute, as opposed to explicitly tasked with duties relating to enforcement.[3] Plaintiff objects to the Report's

---

[3] Courts in the Fifth Circuit look to a variety of factors to determine whether a named defendant satisfies the *Ex parte Young* inquiry, not just who is named in the statute in question. For example, in *K.P v. LeBlanc,* 627 F.3d 115, 124

unsupported conclusion, particularly at this early motion to dismiss stage where this Court must construe all facts and reasonable inferences in Plaintiff's favor. *See Price v. Porter,* 351 F. App'x 925, 926 (5th Cir. 2009) (explaining that when considering a jurisdictional motion to dismiss, courts must take all factual allegations as true, resolving all inferences and ambiguities in the plaintiff's favor).

## B.     Plaintiff Objects to the Report's Conclusion That He Lacks Standing

The "standing doctrine defines and limits the role of the judiciary and is a threshold inquiry to adjudication[;]" federal courts must confirm subject matter jurisdiction exists prior to evaluating the merits of any case. *McClure v. Ashcroft,* 335 F.3d 404, 408 (5th Cir. 2003) (citing *Warth v. Seldin,* 422 U.S. 490, 517 (1975)). The Article III standing inquiry involves three primary considerations: (1) the plaintiff must demonstrate that he has suffered an injury that is both concrete and particularized and actual or imminent (injury in fact); (2) that injury must be fairly

---

(5th Cir. 2010), a Fifth Circuit panel considered whether the Louisiana Patients' Compensation Fund Oversight Board had the requisite "connection [to] the enforcement" of a challenged statute that removed the medical malpractice cap for abortion providers. *Id.* The Board oversaw malpractice claims lodged against physicians enrolled in the Patient Compensation Fund, and the Board denied coverage to the plaintiffs on an abortion-related malpractice claim, relying on the challenged statute. When the plaintiffs sued, the *K.P.* panel of judges looked to whether the Board had powers of "compulsion" or "constraint," and found the Board was required to differentiate allowed claims and those not allowed under the challenged abortion statute.  Thus, the Board took an "active role" in enforcing the statute. The panel held that "the Board's role starts with deciding whether to have a medical review panel consider abortion claims and ends with deciding whether to pay them[;]" this proved sufficient under *Ex parte Young*. *Id.* Similarly, the Comptroller here determines what companies are listed, if they remain on the list, and when to remove them; these responsibilities can be fairly characterized as constraint and compulsion. *See also Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.,* 851 F.3d 507, 519 (5th Cir. 2017) (finding a sufficient enforcement connection where the state officials in question engaged in "rate-setting" under the workers' compensation statute and oversaw the initial arbitration process for provider-insurer fee disputes, because "the officials constrain[ed] [the air-ambulance company's] ability to collect more than the maximum-reimbursement rate under the [workers' compensation statute] . . . [and] effectively ensur[ed] the maximum-reimbursement scheme [was] enforced from start to finish"). Importantly, the *Air Evac* panel noted that *Ex parte Young* does not require direct enforcement of the challenged law: actions constraining the plaintiffs sufficed to apply the *Ex parte Young* exception to the *Air Evac* officials under this court's *K.P.* holding. *Id.*; *see also NiGen Biotech, L.L.C. v. Paxton,* 804 F.3d 389, 393 (5th Cir. 2015) (finding Attorney General Paxton had a sufficient connection to the enforcement of the DTPA, where he sent letters to the manufacturer and distributor of dietary supplements threatening DTPA enforcement, noting that "the fact that Paxton sent letters threatening enforcement … makes it clear that he had not only the authority to enforce [the law], but was also constraining the manufacturer's activities").

traceable to the challenged conduct (causation); and (3) the injury must be capable of being redressed by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.,* 528 U.S. 167, 180-81 (2000). Courts construe allegations of injury liberally, and "general factual allegations of injury resulting from the defendant's conduct may suffice." *La. State Conf. of the NAACP v. Louisiana,* No. 19-479-JWD-SDJ, 2020 U.S. Dist. LEXIS 246999, at *59-60 (M.D. La. June 26, 2020). Plaintiff objects to the Report's unfounded conclusion that he fails to sufficiently allege the injury in fact and redressability components of Article III standing.

1.  *The Report errs in concluding Plaintiff fails to plead a credible threat of future injury*

Plaintiff objects to the Report's determination that he "has not and cannot show that prior or future divestment as regulated by the statute has or will cause him financial harm." Dkt. 32 at 10. At the outset, Plaintiff respectfully reminds this Court that he does not premise his injury on past divestment from any particular asset, but rather claims the ongoing and future injury which runs coterminous with the continued application of unconstitutional legislation. Dkt. 27 at 8. The Report concludes that Plaintiff fails to establish a credible threat of future injury, and that cases he cites in his Response to Defendants' Motions to Dismiss do not support his claims. Plaintiff objects to this finding. Cases need not be identical in order to have analytical value to the Court. The Report opines that *New Orleans ILA Pensioners Ass'n v. Bd. Of Trs. Of New Orleans Empr's Int'l Longshoremen's Ass'n AFL-CIO Pension Fund,* No. 07-6349, 2008 WL 214654, at *3 (E.D. La. Jan. 24, 2008) "is not persuasive[,]" because a plaintiff "does not have standing to sue on behalf of the[ir] [p]lan" unless they establish the remaining pool of assets is inadequate for existing liabilities. First, Plaintiff sues on his own behalf, not on behalf of the plan itself. This material difference for purposes of standing receives no recognition in the Report. *ILA Pensioners Ass'n* has relevance because of its discussion of future harm within the context of a defined-benefit plan,

but the Report treats the holding as if it creates a binding formula for injuries involving these plans; that conclusion misrepresents the holding. Second, the Report concludes that "Abdullah has not argued that Chapter 808 puts the entire ERS in jeopardy (or even his annuity in jeopardy)[;]" this conclusion contradicts the plain language of his Complaint. Dkt. 32 at 11. Plaintiff does argue precisely that, claiming that he "as well as all other similarly situated individuals" bear direct harm from the risk to his pension benefits created by Section 808's unconstitutional considerations. *See, e.g.,* Dkt. 1 at ¶ 108.

Plaintiff similarly objects to the Report's conclusion that he has "not shown that his future benefits will be affected, and that he has certainly not shown a harm that is immediately impending[,]" or "identified a credible chain of events resulting in potential loss to him." Dkt. 32 at 12-13. Plaintiff's Complaint alleges that Section 808 remains currently in effect, that divestments have occurred and continue to occur, and that his own personal financial interests are and will continue to be impacted by this. This is not hypothetical; it is immediate and actual. Questions regarding a specific dollar amount of harm are not appropriate for the pleadings stage, and factual questions should either be resolved in favor of the nonmovant or deferred until the discovery process. Furthermore, the speculative conclusion in the Report that Plaintiff's financial interests will definitively <u>not</u> be harmed is no more appropriate than asking him to provide a dollar amount at this pleadings stage of the litigation.[4] The Report erroneously draws a false equivalence between generalized environmental concerns by activists and groups, and Plaintiff's interest in his

---

[4] The Report asserts that Plaintiff could have withdrawn his funds and chosen to roll them over into a different fund. Dkt. 32 at 9. This ignores two things: first, Plaintiff continues to actively contribute through his current employer, so even the Report's erroneous assumption does not address the entirety of Plaintiff's interests. Second, while well beyond the appropriate pleading analysis applicable to this stage, the Report's assumptions that Plaintiff simply "could have withdrawn his funds" ignore the complicated realities of potentially doing so. *See, e.g.*, https://ers.texas.gov/contact-ers/additional-resources/faqs/What-happens-to-my-benefits (listing the myriad restrictions and penalties applicable to potential withdrawal of funds). Again, however, this level of second-guessing Plaintiff's facially sufficient claims exceeds the permitted analysis at this stage.

own accrued and vested financial property contained within the funds.  The Fifth Circuit recently made a similar acknowledgement in *Ghedi v. Mayorkas*, observing that "[c]omparing *Lujan* to this case, though, is an apples-to-oranges comparison."  No. 20-10995, 2021 U.S. App. LEXIS 32009, at *14 (5th Cir. Oct. 25, 2021) (contrasting *Lujan*, 540 U.S. at 563).  In *Ghedi*, the Fifth Circuit found that a plaintiff alleging placement on a terrorist watchlist plausibly pled standing where his "Fifth Amendment claims [were] directed [at] an agency policy," which "ameliorates the traceability problem" that might otherwise exist. *Id*. at *16 n.40.

Plaintiff next objects to the Report's conclusion that he cannot show injury, because Section 808.056 provides safeguards against divestment decisions that would harm the fund. Dkt. 32 at 10. The Report states that Chapter 808 "explicitly" protects the value of the pension fund and prioritizes this protection over divestment, but the quoted language from the statute is less protectionist than the Report indicates. *Id.* Section 808.056 provides, in relevant part, that divestment "may" be ceased "only if clear and convincing evidence" shows that the "state governmental entity has suffered or will suffer a loss" in the value of "all assets[,]" and that divestment from a listed company may occur "only to the extent necessary." *Id.* (quoting TEX. GOVT. CODE § 808.056). This language neither commands nor favors financial protection over divestment. Its use of "may" is permissive, not mandatory, and demands clear and convincing evidence that divestment will harm <u>all</u> assets of the fund prior to any action. *Id.* A hypothetical opposite statutory mandate that divestment *may* occur only upon clear and convincing evidence would be more indicative of financial priorities over political ones. Instead, divestment stands as the default in the current statutory framework.

Additionally, Plaintiff objects to the Report's conclusion that Plaintiff suffered no particularized harm. Dkt. 32 at 14. An injury qualifies as particularized "when it affects the plaintiff

in a personal and individual way." *Vaughan v. Lewisville Indep. Sch. Dist.,* 475 F. Supp. 3d 589, 593 (E.D. Tex. 2020). Plaintiff claims injury to his own specific pension fund, presently administered pursuant to Section 808; he does not claim an abstract ideological disagreement with the law. The Report's false characterization that his claims are "no more than generalized grievances about state policy" turns a blind eye to the actual language of his Complaint. Dkt. 32 at 13. The Report further posits that his harm is not particularized because "a participant in a defined benefit pension plan has an interest in his fixed future payments only, not the assets of the pension fund." Dkt. 32 at 14 (citing *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439-40 (1999)). The Report erroneously relies on *Hughes Aircraft Co.* for support of its particularization argument. First, *Hughes Aircraft Co.* is not a standing case, and it does not address the issue of particularized harm. Additionally, rather than undermining Plaintiff's claim, the language and analysis in *Hughes Aircraft Co.* actually supports Plaintiff's standing argument. After outlining the differences between an ERISA defined contribution plan and an ERISA defined benefit plan, the *Hughes* court held that "no plan member has a claim to any *particular* asset that composes a part of the plan's general asset pool[;]" [i]nstead, members have a right to" their "accrued benefits." *Hughes Aircraft Co.,* 525 U.S. at 439-40 (emphasis added). As noted repeatedly throughout Plaintiff's Response to Defendants' Motion to Dismiss, Plaintiff does not claim an interest in any particular asset of the fund. He claims an interest in his own benefits and the appropriate administration of them, expressly as *Hughes* permits. Regardless, the likelihood of Plaintiff's accrued benefits being harmed goes to the question of credible threat to future injury and creates a fact issue, as discussed above, and does not speak to the particularization inquiry. The Report next undertakes a specific standing analysis for Plaintiff's individual claims, concluding that he lacks standing as to each. Plaintiff objects to each of these findings below.

2.   *The Report errs in concluding Plaintiff lacks standing to assert his First Amendment Right to Free Speech*

Plaintiff objects to the Report's conclusion that he lacks a particularized injury under the First Amendment because he has not pled an "injury to himself or his ability to express himself" and his views on the BDS movement. Dkt. 32 at 15. As explained throughout Plaintiff's Complaint and fully briefed in his Response, Plaintiff does not now, nor has he ever, claimed that his injury is to his own ability to speak. Dkt. 27 at 12-14. Rather, his injury stems from his financial interests being administered pursuant to a statute that is unconstitutional under the First Amendment's prohibition against, *inter alia,* viewpoint discrimination. Plaintiff objects to the Report's recommendation that this Court dismiss his claim for want of standing, based on its own mischaracterization of the injury alleged.

Plaintiff additionally objects to the Report's determination that he does not properly assert overbreadth standing under the First Amendment. Dkt. 32 at 15-16. Plaintiff concedes that the cases cited in his response are not identical to his own; however, they do support standing in this matter. First, Plaintiff objects to the Report distinguishing *Clark v. City of Lakewood,* 259 F.3d 996, 1010-11 (9th Cir. 2001). The court in *Clark* applied the overbreadth doctrine to confer standing on the plaintiff, even though he alleged no loss of his own ability to speak freely. Instead, he alleged a financial injury to his business as a result of the promulgation of unconstitutional litigation. *Id.* The court ruled on a motion for summary judgment, after discovery occurred. Conversely, here Plaintiff and this Court have no benefit from discovery. When evaluating a motion to dismiss, courts are bound by a standard deferential to plaintiffs; the Report's dismissal of the relevance of *Clark* is inappropriate. The Report next distinguishes *Mothershed v. Justices of Supreme Court,* opining that it does not apply to Plaintiff's situation because he "cannot establish he has suffered a financial harm." Dkt. 32 at 16; 410 F.3d 602, 611 (9th Cir. 2005).  And

yet, nothing in the text of the *Mothershed* opinion requires a Plaintiff to plead a dollar amount injury in order to show damage to his financial interests. And, Plaintiff reiterates that questions involving exact harm are not appropriate for this stage. Finally, as noted throughout these objections, Plaintiff objects to the Report's insistence that he can only demonstrate standing if he can show specific financial harm; the law does not require this. Plaintiff complains of the risk of ongoing and future harm created by administering his pension benefits pursuant to an unconstitutional law which is unmoored from any connection to maximizing financial benefits.

   3. *The Report errs in concluding Plaintiff lacks standing to assert his Establishment Clause claim*

With respect to the Establishment Clause, Plaintiff objects to the Report's citation to *Valley Forge Christian Coll. v. Ams United for Separation of Church & State, Inc.,* 454 U.S. 464, 474 (1982) for the proposition that Plaintiff lacks standing. Dkt. 32 at 16. Plaintiff does not object as a mere observer to the challenged law; his pension benefits are administered pursuant to it. The remainder of the Report's Establishment Clause discussion is effectively addressed in Plaintiff's Response to Defendants' Motions to Dismiss. Dkt. 27 at 11-13. To specifically object to each statement in the Report's Establishment Clause briefing would therefore run afoul of this Court's prohibition against objecting by merely reiterating prior arguments. He therefore objects for purposes of preservation and directs the Court to his prior briefing on this issue.

   4. *The Report erred in concluding that Plaintiff lacks standing to plead a violation of the Due Process Clauses of the Fourteenth Amendment*

Plaintiff objects to the Report's conclusion that he lacks standing to bring a due process violation based on his interest in his investment accounts, and the potential harm created by Section 808. In order to allege a due process claim, a plaintiff must show (1) a property interest protected by the Fourteenth Amendment; and (2) that the loss of that interest amounts to a deprivation of due process. *See Blackburn v. City of Marshall,* 42 F.3d 925, 935 (5th Cir. 1995). Plaintiff objects

to the Report's characterization that Plaintiff fails to identify a property interest because he "does not point to a statute providing him with a property right in the management of the ERS." Dkt. 32 at 17.[5] A property interest need not be prescribed by statute in order to give rise to a due process claim. Rather, for "a person to have a property interest within the ambit of the Fourteenth Amendment, he 'must have more than an abstract need or desire for it[;]' … [h]e must, instead, have a legitimate claim of entitlement to it." *Blackburn*, 42 F.3d at 936 (quoting *Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972)). Such property interests "stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions or mutually explicit understandings" *Id.* The "hallmark of property" is "an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982). Plaintiff's property interests in his retirement funds were created by and are administered pursuant to a State of Texas created program, with mandatory Texas public employee participation. Dkt. 1 at ¶¶ 10-13. He does not claim a right to any particular asset administered by the program or any specific divestment decision, but only to his own pension benefits. The Report halts its due process analysis after concluding that he fails to establish an injury to a property interest; it does not address whether the process itself is adequate. Dkt. 32 at 18. Plaintiff therefore objects to the Report's conclusion that he fails to plead a cognizable interest in, or loss of, a

---

[5] As discussed more fully in Plaintiff's Response, Section 808.004 of the Texas Government Code specifically prohibits individuals from attempts to exercise their rights and challenge the anti-BDS mandate it imposes: "A person … may not sue or pursue a private cause of action against [state entities, employees, officers, or contractors] for any claim or cause of action, including breach of fiduciary duty, or for violation of any constitutional, statutory, or regulatory requirement in connection with any action … made or taken in connection with this chapter." The Report's implication that Plaintiff needs to be affirmatively given a right to assert challenges rewards exactly the deprivation this statute seeks to impose.

property interest in his pension benefits, and incorporates by reference the briefing contained in his Response to Defendants' Motion to Dismiss for the remainder of the analysis.[6]

     *5.  The Report errs in concluding Plaintiff lacks standing for his Commerce Clause claim*

     Plaintiff objects to the Report's recommended finding that Plaintiff fails to satisfy standing for breach of the federal government's exclusive power to regulate foreign affairs. Dkt. 32 at 18. The Report relied on *Cibolo Waste, Inc. v. City of San Antonio,* 718 F.3d 469, 476 (5th Cir. 2013) for the proposition that "the only parties that have standing to bring a dormant Commerce Clause challenge are those who both engage in interstate commerce and can show that the ordinance at issue has adversely affected their commerce." Dkt. 32 at 18. However, *Cibolo* is an interstate dormant commerce clause case, and thus irrelevant here. Plaintiff does not allege a domestic Commerce Clause claim. He alleges a violation of the Federal Government's exclusive power to regulate *foreign* affairs. Dkt. 1 at ¶¶ 97-103. Plaintiff objects to the Report's recommendation to dismiss this count, based on its inaccurate characterization of what Plaintiff actually pleads.

     *6.  Redressability*

     Plaintiff objects to the Report's assessment that he fails to satisfy the redressability component of standing because "a Declaratory Judgment that Section 808 is unconstitutional and enjoinment of its use would have no effect on Abdullah's financial interests or his ultimate annuity payments." Dkt. 32 at 19. Once again, the Report fails to properly comprehend the nature of the harm alleged. Plaintiff does not claim a dollar amount reduction to his fund, nor does he need to do so to demonstrate standing. His Complaint makes clear that the nature of the harm rests on the

---

[6] With respect to the process provided, Plaintiff does object to the Report's conclusion that he cannot show harm because,"if [his] fixed benefits are in jeopardy, any divestiture negatively effecting those benefits shall cease." Dkt. 32 at 18. The Report's use of the word "shall" when the statute at issue uses the word "may" is materially significant and inaccurate. *Id.* The difference between a mandatory compulsion and a permissive option bears great legal significance.

very fact that the enactment and enforcement of Section 808 results in his financial interests being administered pursuant to unconstitutional criteria untethered to financial outcomes. Dkt. 1 at ¶¶ 54-55, 65, 90, 96, 103, 108. The Report acknowledges the harm alleged by Plaintiff, but then summarily concludes that redressability does not exist because his financial interest would be unchanged. It thus correctly identifies the injury alleged, and then in the following sentence, makes a redressability determination grounded in a different, incorrectly characterized harm. Assuming for the purpose of the redressability inquiry that this Court finds a cognizable injury in fact, this harm is plainly redressed by a favorable ruling enjoining the enforcement of Section 808. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992) (explaining that redressability exists where a reasonable likelihood exists that the injury alleged with be redressed by a favorable decision). Plaintiff thus objects to the Report's recommendation against finding redressability.

### IV.     Conclusion

For the foregoing reasons, Plaintiff respectfully objects to the Magistrate Judge's Report and Recommendation, and asks that the Honorable Judge Pitman deny Defendants' Motions to Dismiss and permit Plaintiff to proceed with this litigation.

Respectfully submitted,

*/s/ Christina A. Jump*
Christina A. Jump
Texas Bar No. 00795828
cjump@clcma.org
Alyssa F. Morrison
Texas Bar No. 24110135
amorrison@clcma.org
Constitutional Law Center for
Muslims in America ("CLCMA")
100 North Central Expy., Ste. 1010
Richardson, TX 75080
Phone: (972) 914-2507
Fax: (972) 692-7454

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2021, a true and correct copy of the foregoing

Objections to Report and Recommendations of the United States Magistrate Judge was served via

the Court's CM/ECF system to all counsel of record.

/s/ *Christina A. Jump*
Christina A. Jump
Counsel for Plaintiff
